1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NOAH SPATH, et al.,

Plaintiffs,

v.

COUNTY OF SANTA CLARA, et al.,

Defendants.

Case No.  22-cv-07599-JSC

**ORDER RE: MOTION TO DISMISS**

Re: Dkt. No. 19

Noah Spath and his father, Tim Spath, bring claims against the County of Santa Clara and Santa Clara Valley Medical Center related to involuntary treatment Noah received during a mental health crisis.  (Dkt. No. 1.)[1]  Before the Court is Defendants' motion to dismiss.  (Dkt. No. 19.) After carefully considering the briefing, the Court concludes oral argument is unnecessary, *see* N.D. Cal. Civ. L.R. 7-1(b), VACATES the April 19, 2023 hearing, and GRANTS the motion with leave to amend.

**COMPLAINT ALLEGATIONS**

Noah, whose family lives in Santa Clara County, developed mental health issues around the age of 16.  (Dkt. No. 1 ¶ 5.)  He was initially diagnosed with depression and anxiety disorder and later with schizophrenia.  (*Id.* ¶ 67.)  With effective treatment from his psychiatrist and psychologist, Noah managed his condition, with periodic episodes requiring intervention.  (*Id.* ¶¶ 6–7.)

On May 12, 2021, at the age of 19, Noah suffered an episode that led him to walk around his neighborhood in his underwear.  Tim went looking for Noah around 10:30 p.m. and found

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

1    Noah's sweatpants on the sidewalk.  (*Id.* ¶¶ 69–70.)  Tim and Noah's mother, Tracey Spath, called

2    the Gilroy Police Department and a dispatcher told them Gilroy police had taken Noah to St.

3    Louise Regional Hospital on a Welfare & Institutions Code § 5150 hold.  (*Id.* ¶ 71.)  St. Louise is

4    "not an approved location for [Section] 5150 evaluation and treatment."  (*Id.* ¶ 72.)  Instead,

5    Gilroy police used St. Louise "as a temporary location pending transfer to the county mental

6    health facility at Santa Clara Valley Medical Center" ("SCVMC"), which is "one of several

7    facilities designated by the Santa Clara County Behavioral Health Department for involuntary

8    assessment, evaluation, and for [Section] 5150 holds."  (*Id.* ¶¶ 72–73.)  St. Louise staff initially

9    diagnosed Noah as tachycardic and COVID-19 positive.  (*Id.* ¶¶ 30, 75.)  He was held in the

10   emergency department overnight while waiting for a bed in emergency psychiatric services at

11   SCVMC.  (*Id.* ¶ 74.)

12        On the morning of May 13, Noah walked out of the hospital of his own accord.  (*Id.* ¶¶ 31,

13   76.)  Gilroy police found Noah hiding under a car.  (*Id.* ¶ 76.)  St. Louise informed the police that

14   Noah was on a Section 5150 hold and COVID-19 positive, and the officers brought Noah back to

15   St. Louise.  (*Id.*)  Noah told St. Louise staff he had left because he did not think he needed to go to

16   an emergency psychiatric facility.  (*Id.* ¶ 33.)  A St. Louise emergency department physician gave

17   Noah the "final psychiatric diagnoses" of psychosis and suicidal ideation.  (*Id.* ¶¶ 32, 77.)  St.

18   Louise staff spoke with SCVMC's emergency psychiatric services and informed them about

19   Noah's medical status.  (*Id.* ¶¶ 77, 79.)  Gilroy police stayed at Noah's bedside until paramedics

20   transferred Noah, in restraints, to SCVMC's emergency psychiatric services.  (*Id.* ¶¶ 34–35, 78,

21   80.)  He arrived around 1:00 p.m. on May 13.  (*Id.* ¶ 80.)

22        Noah waited for four hours in emergency psychiatric services, without receiving

23   psychiatric treatment, until around 5:00 p.m., when he was transferred to the SCVMC emergency

24   department "for medical clearance for his known fever and positive COVID test."  (*Id.* ¶ 81.)

25           This transfer took Noah away from the secure and safe mental health
26           facility and put him with the general population, without any mental
             health professional accompanying him, and in an unsafe and unsecure
27           environment.

28           He was in minor distress and had no symptoms or risk factors to
             require treatment other than isolation to protect others. His Covid

2

symptoms were consistent with the same symptoms he exhibited at [St. Louise].

(*Id.* ¶¶ 82–83.) Two people who were not mental health professionals escorted Noah. (*Id.* ¶¶ 42, 82, 85.) Neither wore a mask or interacted with Noah other than to tell him where to go. (*Id.* ¶¶ 40, 42, 85.) Noah did not wear a mask in the emergency department. (*Id.* ¶¶ 40, 85.)

Noah "did not want or need" COVID treatment and objected to treatment. (*Id.* ¶¶ 37, 84, 90.) Noah "was placed in a room," "required to lie in a bed," and given an IV against his will and without his consent or his parents' consent. (*Id.* ¶¶ 37, 83, 86, 90, 92.) "He begged to go home but he was ignored." (*Id.* ¶ 83.)

> By this time, Noah had been detained for over 24 hours without receiving any psychiatric treatment. He had been without his support system which included his home, his family, and his psychiatrist, without receiving any compensating treatment or assistance. His medications were at home and not available to him. Whatever his condition was at the time that [Gilroy police] first detained him, was worsening due to a lack of care, support, medication, and medical assistance.

(*Id.* ¶ 88; *see id.* ¶ 39.) Throughout the Section 5150 hold, Noah "never received any mental health assessment, evaluation, or treatment at SCVMC despite being initially admitted to [emergency psychiatric services]." (*Id.* ¶ 89.)

While Noah's escort "was busy texting on his cell phone," Noah removed the IV, left the room, and wandered away. (*Id.* ¶ 43.) Across the street from the hospital, Noah borrowed a phone from a college security guard, called his parents, and asked them to pick him up. (*Id.* ¶ 45.) Tim and Tracey "were immediately aware of their son's danger and the imminence of his injury." (*Id.* ¶ 152.) Tim drove in a rush to get Noah. (*Id.* ¶ 46.) Tracey called SCVMC "to find out what was going on and why her son was not getting treatment." (*Id.* ¶ 47.) "She had been on the phone over these many hours trying to coordinate treatment and support services," but "never received any assistance for her son." (*Id.* ¶¶ 47, 150.)

While Noah was waiting for Tim, SCVMC staff panicked and located Noah. (*Id.* ¶ 48.) "Their panic and aggression created terror in Noah's fragile state" and he "fled to the fourth floor of a nearby parking structure." (*Id.* ¶¶ 48–49.) As staff ran after him, Noah jumped off the ledge of the parking structure into a tree. (*Id.* ¶ 49.) Noah "begged to see his parents" but was "not

allowed to speak to [them] by phone." (*Id.* ¶¶ 49, 52.)  The SCVMC staff at the scene did not call in a psychiatrist, mental health professional, negotiator, or interventionalist.  (*Id.* ¶¶ 50–51.)  "Desperate, psychotic, and untreated, Noah jumped from the tree." (*Id.* ¶ 53.)  "He landed flat on his face and lost consciousness." (*Id.* ¶ 54.)  Tim arrived "just after his son dropped from the tree to the ground" and was aware Noah had been injured. (*Id.* ¶¶ 149, 151.)  As a result of the fall, Noah "suffers from permanent brain damage, . . . is partially crippled, and has a myriad of disabilities which require a lifetime of care." (*Id.* ¶ 55.)

Noah, through Tracey as guardian ad litem, (Dkt. No. 13), brings claims of (1) unreasonable seizure in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 13 of the California Constitution; (2) denial of due process in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 7 of the California Constitution; (3) violation of California's Bane Act; (4) negligence; and (5) medical negligence in violation of California's Medical Injury Compensation Reform Act ("MICRA").  Tim brings a claim of (6) negligence.

## DISCUSSION

## I.    NOAH'S CONSTITUTIONAL CLAIMS

### A.    Federal Constitutional Rights (Counts One and Two)

To state a claim under Section 1983 against a municipality, a plaintiff must allege: "(1) [he] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (cleaned up).

Section 5150 allows certain medical professionals and law enforcement officers to place a person in an approved mental health facility for up to 72 hours for evaluation and treatment if there is probable cause to believe the person "is a danger to others, or to himself or herself, or gravely disabled" "as a result of a mental health disorder."  Cal. Welf. & Inst. Code § 5150(a); *see Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007).  The Section "is intended to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to

individuals with mental disorders who are either dangerous or gravely disabled," while "preventing inappropriate, indefinite commitments of mentally disordered persons." *Ford v. Norton*, 89 Cal. App. 4th 974, 977, 979 (2001).  A person on a Section 5150 hold is detained by the state, implicating rights protected by the Fourth and Fourteenth Amendments.  *See Jensen v. Lane County*, 312 F.3d 1145, 1146 (9th Cir. 2002) ("Courts repeatedly have echoed the Supreme Court's admonition that involuntary civil commitment to a mental hospital represents a massive curtailment of liberty and that such a commitment therefore must comport with the requirements of due process." (cleaned up)); *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991), *as amended* (Apr. 1, 1992) ("Although confinement of the mentally ill by state action generally is analyzed under the due process clause of the fourteenth amendment, we analyze here the distinct right to be free from an unreasonable governmental seizure of the person for whatever purpose." (cleaned up)).

The Spaths' complaint invokes the Fourth, Fifth, and Fourteenth Amendments.  Their opposition to the motion to dismiss focuses on the Fourteenth Amendment and characterizes their theories as the right to safe conditions, right to adequate medical care, right against prolonged hold, and right to refuse treatment.  The Spaths do not challenge the initial Section 5150 hold on Noah.  They do not argue the *initial* hold lacked the probable cause required by the statute, *see People v. Triplett*, 144 Cal. App. 3d 283, 287–88 (1983); violated Noah's Fourth Amendment rights to be free from unreasonable seizure and excessive force, *see Julian v. Mission Cmty. Hosp.*, 11 Cal. App. 5th 360, 387–89 (2017), *as modified* (May 23, 2017); or violated Noah's Fourteenth Amendment due process rights, *see Jensen*, 312 F.3d at 1147–48.  Rather, the Spaths challenge the continuing hold and the care, or lack thereof, that Noah received.  They contend because Noah was never provided psychiatric treatment at St. Louise or SCVMC, the proper "scope and bounds of a [Section] 5150 hold were exceeded and had ended."  (Dkt. No. 1 ¶ 89.)  They assert the purported Section 5150 hold became an unlawful detention during which Noah was deprived of his day-to-day psychiatric treatment and support system and was subjected to forced COVID-19 treatment unrelated to his psychiatric condition.  (*See id.* ¶¶ 39, 84, 88–89.)  They also assert the County and SCVMC's unlawful conduct caused Noah to flee the hospital and suffer injury.  (*See*

5

*id.* ¶¶ 26, 106, 114, 136.)

Because the gravamen of the complaint relates to conduct during the Section 5150 hold (not its initiation) by medical professionals (not law enforcement), the Fourteenth Amendment due process clause is the proper framework for the federal constitutional claims. *See Maag*, 960 F.2d at 775; *Austen v. County of Los Angeles*, No. 15-07372 DDP (FFMX), 2018 WL 501552, at *9 n.8 (C.D. Cal. Jan. 19, 2018) ("The court countenances that there may be other circumstances in which a Fourth Amendment analysis is appropriately applied to the actions of medical personnel, but concludes that here, the specific contours of the Fourteenth Amendment analysis provide more guidance as to the propriety of medical conduct and decision-making."); *cf. Townsend ex rel. Townsend v. County of Santa Cruz*, No. 19-CV-00630-BLF, 2021 WL 3913174, at *3 n.4 (N.D. Cal. Sept. 1, 2021) (noting the complaint "appears to assert a § 1983 claim for violation of the right to be free from unreasonable seizure as guaranteed by the Fourth Amendment," but that plaintiff "clarified in his briefing and during oral argument that his § 1983 claim is brought under the Fourteenth Amendment only"). The Spaths do not dispute that the Fifth Amendment due process clause "only applies to the federal government" and therefore is not a viable basis for their claims here. *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008).

### 1.    Fourteenth Amendment Due Process

In the involuntary commitment context, the "*Youngberg* professional judgment standard" governs Fourteenth Amendment due process claims. *Ammons v. Wash. Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011); *see Youngberg v. Romeo*, 457 U.S. 307, 321–23 (1982). "[L]iability may be imposed . . . when the decision made by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Ammons*, 648 F.3d at 1027 (cleaned up).

While "[m]any of the cases applying *Youngberg* address the [Fourteenth Amendment] right of involuntarily committed individuals to 'safe conditions,'" *Townsend*, 2021 WL 3913174, at *9, district courts have also applied the standard to Fourteenth Amendment due process claims regarding adequate mental health care during a Section 5150 hold. *See id.* at *10; *Austen*, 2018

1    WL 501552, at *9 ("After [Plaintiff] was admitted to [the hospital] for mental health treatment and

2    evaluation, the court concludes that the Fourteenth Amendment due process standards apply to

3    ensure . . . he was evaluated and assessed on the basis of substantive and procedural criteria that

4    are not substantially below the standards generally accepted in the medical community." (cleaned

5    up)).  Following those district court cases, the Court concludes the *Youngberg* professional

6    judgment standard governs Noah's claims regarding safe conditions, adequate mental health care,

7    prolonged hold, and forced medical treatment.

8           The complaint plausibly alleges violations of that standard.  The complaint alleges police

9    took Noah into custody due to his mental health crisis.  Noah was diagnosed at St. Louise with

10   psychosis and suicidal ideation and St. Louise communicated those diagnoses to SCVMC.  Noah

11   did not receive psychiatric treatment for more than 24 hours, was deprived of his usual

12   medications at home, and was not able to speak with his parents or other support.  Although Noah

13   had walked out of St. Louise earlier the same day, he was again able to leave SCVMC without

14   being stopped.  After Noah left SCVMC and jumped into a tree, staff pursued him in a way that

15   escalated his crisis rather than calling in another kind of professional.  These allegations plausibly

16   support an inference that the care Noah received while involuntarily detained fell substantially

17   below the generally accepted standards or constituted a substantial departure from accepted

18   professional judgment.  *See Ammons*, 648 F.3d at 1027; *cf. Townsend*, 2021 WL 3913174, at *10

19   ("[A] reasonable jury could find that the standard of care required a psychiatric consultation before

20   [Plaintiff] was released from the 5150 hold, and that the release based solely on the concurrence of

21   an RN and a MFT was such a substantial departure from accepted professional judgment, practice,

22   or standards as to rise to the level of a constitutional violation under the *Youngberg* professional

23   judgment standard." (cleaned up)).

24          The complaint also alleges Noah objected to and refused medical treatment that was

25   unrelated to his psychiatric condition, plausibly supporting an inference that he was competent to

26   refuse such treatment.  After Noah was transferred from emergency psychiatric services, he was

27   not isolated or masked, his escorts were not masked, and he was placed in the emergency

28   department around members of the public.  He was treated with an IV to which he objected and

7

did not consent.  As alleged, forced medical treatment unrelated to the psychiatric basis for Noah's Section 5150 hold plausibly supports an inference the treatment fell substantially below the generally accepted standards or constituted a substantial departure from accepted professional judgment.  *See Ammons*, 648 F.3d at 1027; *cf. Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 287 (1990) (O'Connor, J., concurring) (noting a "protected liberty interest in refusing unwanted medical treatment" that encompasses "the refusal of artificially delivered food and water"); *Almerico v. Denney*, 532 F. Supp. 3d 993, 1002 (D. Idaho 2021) (applying *Cruzan* to conclude that life support, against a person's will as laid out in her advance directive, "violates the constitutional right of a competent person to refuse unwanted lifesaving medical treatment").

In sum, the complaint adequately alleges Noah had Fourteenth Amendment rights of which he was deprived.  *See Gordon*, 6 F.4th at 973.

## 2.    Municipal Policy

"A governmental policy is a deliberate choice to follow a course of action by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* (cleaned up).

> A plaintiff can satisfy *Monell*'s policy requirement in one of three ways.  First, a local government may be held liable when it acts pursuant to an expressly adopted official policy.
>
> Second, a public entity may be held liable for a longstanding practice or custom.  Such circumstances may arise when, for instance, the public entity fails to implement procedural safeguards to prevent constitutional violations or, sometimes, when it fails to train its employees adequately.
>
> Third, a local government may be held liable under Section 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gordon*, 6 F.4th at 973–74 (cleaned up).

The complaint does not explain which form of municipal policy the Spaths are challenging.  Nor does it identify a specific policy.  It offers only conclusory allegations, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that Defendants had an official policy, longstanding practice, or ratification.  (*See* Dkt. No. 1 ¶¶ 24–27.)  The complaint alleges a 2002 civil grand jury

United States District Court
Northern District of California

report found inadequate staffing at SCVMC, which "has persisted and contributed to the lack of mental health treatment provided to Noah," but does not explain how Noah's treatment is attributable to inadequate staffing. (*Id.* ¶ 38.)  The Spaths' opposition to the motion to dismiss cites a more recent report and correction plan, (Dkt. No. 24-1 at 4–201), but the complaint itself must contain allegations plausibly supporting a municipal policy. *See Gordon*, 6 F.4th at 973. Without identifying a policy, the complaint also does not allege the policy amounted to deliberate indifference and was the moving force behind the alleged Fourteenth Amendment due process violations.

Accordingly, the complaint does not state a Section 1983 claim against the municipality Defendants.

**B.      State Constitutional Rights (Counts One and Two)**

The protections of Article I, Section 7 of the California Constitution "substantially overlap" with Fourteenth Amendment due process. *Today's Fresh Start, Inc. v. L.A. Cnty. Off. of Educ.*, 57 Cal. 4th 197, 212 (2013).  However, "an action for damages is not available" for "an alleged violation of a provision of the California Constitution, in the absence of a statutory provision or an established common law tort authorizing such a damage remedy for the constitutional violation." *Katzberg v. Regents of Univ. of Cal.*, 29 Cal. 4th 300, 303 (2002); *see Today's Fresh Start*, 57 Cal. 4th at 205 (writ petition, not action for damages).  As the Spaths do not identify a statutory provision or an established common law tort authorizing damages for an Article I, Section 7 violation, Noah does not have a cause of action.

Similarly, the protections of Article I, Section 13 "parallel[]" those of the Fourth Amendment. *Sanchez v. County of San Diego*, 464 F.3d 916, 929 (9th Cir. 2006); *see People v. Boulter*, 199 Cal. App. 4th 761, 768 (2011).  Thus, for the reasons discussed above with respect to the Fourth Amendment, Section 13 is not a proper framework for the due process theories Noah asserts.  Moreover, although *Katzberg* only analyzed a Section 7 damages claim, its reasoning would similarly foreclose a Section 13 damages claim in the absence of a statutory provision or established common law tort. *See Wigfall v. City & County of San Francisco*, No. C 06-4968 VRW, 2007 WL 174434, at *3–6 (N.D. Cal. Jan. 22, 2007) (applying *Katzberg* and concluding

United States District Court
Northern District of California

9

1    "nothing in the text of article I, § 13 impels the court to infer an intent to authorize a damages

2    action").  As with Section 13, Noah does not have a cause of action under Section 7.

3                                              * * *

4         The Spaths' complaint adequately alleges only the first of four elements required to state a

5    Fourteenth Amendment Section 1983 claim against Defendants.  *See Gordon*, 6 F.4th at 973.  The

6    complaint does not state a claim based on the Fourth or Fifth Amendment to the U.S. Constitution

7    or Article I, Section 7 or 13 of the California Constitution.  Accordingly, Defendants' motion is

8    GRANTED as to counts one and two of the complaint, with leave to amend.  *See Yagman v.*

9    *Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017).

10   **II.      STATE LAW CLAIMS**

11        **A.      Tim's Negligence Claim (Count Six)**

12        Tim's negligence claim is based on emotional distress he suffered when he "arrived just

13   after his son dropped from the tree to the ground" and was immediately "aware that his child had

14   been injured."  (Dkt. No. 1 ¶¶ 149, 151.)  The complaint does not allege Tim was physically

15   injured.  *Cf. Long v. PKS, Inc.*, 12 Cal. App. 4th 1293, 1301 (1993) (holding plaintiff who

16   "suffered physical injury" could recover "all reasonably foreseeable damages," including

17   emotional distress from witnessing her foster daughter die in the same car crash).

18        Under California law,

19              a plaintiff may recover damages for emotional distress caused by
                observing the negligently inflicted injury of a third person if, but only
20              if, said plaintiff: (1) is closely related to the injury victim; (2) is
                present at the scene of the injury producing event at the time it occurs
21              and is then aware that it is causing injury to the victim; and (3) as a
                result suffers serious emotional distress—a reaction beyond that
22              which would be anticipated in a disinterested witness and which is not
                an abnormal response to the circumstances.
23

24   *Thing v. La Chusa*, 48 Cal. 3d 644, 667–68 (1989).  The second requirement has been interpreted

25   to include "a contemporaneous perception of the injury-producing event," such as seeing child

26   abuse on a live "nanny cam" feed.  *Ko v. Maxim Healthcare Servs., Inc.*, 58 Cal. App. 5th 1144,

27   1157 (2020), *as modified* (Jan. 14, 2021).  The California Supreme Court has explained that

28   although these restrictions are in some ways arbitrary, "we balance the impact of arbitrary lines

United States District Court
Northern District of California

1    which deny recovery to some victims whose injury is very real against that of imposing liability

2    out of proportion to culpability for negligent acts." *Thing*, 48 Cal. 3d at 664.  "When the right to

3    recover is limited" to "those who because of their relationship" and contemporaneous perception

4    "suffer the greatest emotional distress," "the liability bears a reasonable relationship to the

5    culpability of the negligent defendant." *Id.* at 667.

6         The complaint does not satisfy the second requirement because it does not allege Tim was

7    present at the scene at the time Noah's injury occurred.  Nor does it allege Tim

8    contemporaneously perceived the injury-producing event in some other way.  Accordingly, Tim

9    does not state a claim for negligence.  Defendants' motion is GRANTED as to count six of the

10   complaint, with leave to amend.  *See Yagman*, 852 F.3d at 863.

11        **B.      Noah's Bane Act Claim (Count Three)**

12        The Tom Bane Civil Rights Act authorizes "[a]ny individual whose exercise or enjoyment

13   of rights secured by the Constitution or laws of the United States, or of rights secured by the

14   Constitution or laws of this state, has been interfered with, or attempted to be interfered with," to

15   sue for damages.  Cal. Civ. Code § 52.1(c).  Interference means "a person or persons" "interferes

16   by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion."

17   *Id.* § 52.1(b).

18        Although "[n]o California court has directly interpreted the Bane Act's 'person or persons'

19   language" with respect to municipalities, "several federal courts interpreting the statute have

20   concluded municipalities do fall within its purview."  *Sanchez v. City of Fresno*, 914 F. Supp. 2d

21   1079, 1117 (E.D. Cal. 2012); *see Aguilar v. City of South Gate*, No. 2:12-CV-10669-ODW, 2013

22   WL 300914, at *6 (C.D. Cal. Jan. 25, 2013) ("[E]ven cursory research into Bane Act

23   jurisprudence reveals myriad cases pled directly against cities.").  Following the reasoning of

24   those cases, Defendants' motion to dismiss on the basis that the Bane Act does not apply to

25   municipalities is DENIED.

26        However, the Bane Act does not override any statutory immunity that otherwise expressly

27   bars a claim.  *See Towery v. State*, 14 Cal. App. 5th 226, 231–36 (2017), *as modified* (Aug. 14,

28   2017) ("[I]f a specific immunity statute applies, it cannot be abrogated by a statute which simply

United States District Court
Northern District of California

1    imposes a general legal duty or liability." (cleaned up)).  The Spaths do not contend that any part

2    of the Bane Act creates an exception from a statutory immunity.  *Cf. id.* at 234 ("Nothing in Civil

3    Code section 52.1 indicates an intent to abrogate this specific immunity provision.").  Thus, the

4    Court analyzes Defendants' asserted immunities below.

### C.    Immunities (as to Counts Three, Four, and Five)

"In California, all government tort liability is dependent on the existence of an authorizing

statute or enactment."  *Herd v. County of San Bernardino*, 311 F. Supp. 3d 1157, 1171 (C.D. Cal.

2018) (cleaned up).  The California Tort Claims Act "governs all public entities and their

employees and all noncontractual bases of compensable damage or injury that might be actionable

between private persons."  *Caldwell v. Montoya*, 10 Cal. 4th 972, 980 (1995) (cleaned up).

> It establishes the basic rules that public entities are immune from liability except as provided by statute, that public employees are liable for their torts except as otherwise provided by statute, that public entities are vicariously liable for the torts of their employees, and that public entities are immune where their employees are immune, except as otherwise provided by statute.

*Id.* (cleaned up; citing Cal. Gov. Code §§ 815, 815.2, 820).  Defendants invoke five immunities

under the Act.[2]

### 1.    Section 856.2 – Injury by or to escaped person confined for mental illness

Section 856.2 provides, in part:

(a) Neither a public entity nor a public employee is liable for:

(1) An injury caused by an escaping or escaped person who has been confined for mental illness or addiction.

(2) An injury to, or the wrongful death of, an escaping or escaped person who has been confined for mental illness or addiction.

Cal. Gov. Code § 856.2(a).  "[A] person on a 72-hour psychiatric hold is 'confined' for purposes

of section 856.2."  *L.A. Cnty.-U.S.C. Med. Ctr. v. Superior Ct.*, 155 Cal. App. 3d 454, 461 (1984).

Based on the complaint allegations, Noah was "confined for mental illness" as a matter of law at

---

[2] As Defendants do not invoke Section 820.2 (Discretionary acts), the Spaths' arguments about Defendants' obligation to treat Noah are not on point.  *See Caldwell v. Montoya*, 10 Cal. 4th 972, 979–84 (1995).

United States District Court
Northern District of California

the time he left SCVMC.  Cal. Gov. Code § 856.2(1)(1), (2).  He had been detained with probable cause under Section 5150, and his transfer from emergency psychiatric services to the emergency department did not end the confinement.  *See L.A. Cnty.*, 155 Cal. App. 3d at 459–60, 463 (noting patient was still on the 72-hour psychiatric hold when "she was temporary transferred to the County Medical Center" for "sophisticated medical tests" that the mental health services evaluation unit could not provide); *see also Guzman v. County of Los Angeles*, 234 Cal. App. 3d 1343, 1348–50 (1991) (similar).

The Spaths argue Noah was no longer "confined" within the meaning of Section 856.2 because the Section 5150 hold became an unlawful detention as a result of Noah not receiving psychiatric treatment.  This argument is inconsistent with the California Court of Appeal's reasoning in *Los Angeles County*:

> Negligence in restraining a patient on a 72-hour hold does not serve to vitiate the escape immunity of section 856.2. . . .  [T]he Pedregons argue . . . that Lucy 'was not confined and therefore could not escape within the meaning of section 856.2' because she 'was left unattended and could have exited from a number of places in the hospital.' . . . The Pedregons' position confuses the issue of negligence with the immunity issue.  The contention that negligent failure to adequately confine a mental patient would negate the escape immunity in section 856.2 [has been] rejected . . . .  *Before discussing any immunity, one assumes as a matter of course that there is a basis for liability to which the immunity is relevant.*

155 Cal. App. 3d at 461–63 (cleaned up); *see also Kobzoff v. L.A. Cnty. Harbor/UCLA Med. Ctr.*, 19 Cal. 4th 851, 863 (1998) ("Whatever the supposed merits of the underlying claim, however, plaintiffs had no cause of action against the County because [Section 856.2(a)(2)] absolutely protects the County from suit, notwithstanding plaintiffs' evidence that professional malpractice may have contributed to [the patient's] escape.").  Assuming Defendants were negligent at some point during Noah's confinement, such liability would not negate Section 856.2 immunity.

Thus, Section 856.2 immunity shields Defendants, who are public entities, from liability for Noah's injuries when he was "escaping" or after he had "escaped" from SCVMC.  Cal. Gov. Code § 856.2(a)(1), (2).  However, the complaint alleges Noah was harmed not only by injuring himself after he escaped (that is, walked out of the hospital), but also by Defendants' failure to provide psychiatric treatment before he escaped.  *Cf. Brookhouser v. State*, 10 Cal. App. 4th 1665,

13

1685 (1992) (noting patient's treatment plan included "short excursions into the community" and therefore she "became 'an escaping or escaped person'" when she did not return to the facility at the required time of 5:30 p.m.).  It alleges Noah was suffering a mental health crisis, denied access to his medications and support system, and subjected to forced medical treatment.  Section 856.2 immunity does not bar counts three, four, and five of the complaint to the extent they arise from pre-escape allegations.

### 2.     Section 854.8 – Injury by or to a patient

Section 854.8 provides, in part:

> (a) Notwithstanding any other provision of this part, except as provided in this section and in Sections 814, 814.2, 855, and 855.2, a public entity is not liable for:
>
> (1) An injury proximately caused by a patient of a mental institution.
>
> (2) An injury to an inpatient of a mental institution.

Cal. Gov. Code § 854.8(a).

Section 854.8 "provides immunity for diagnosing, treating, confining, and releasing the mentally ill, but makes clear that public entitles and employees are liable for injuries caused by negligent or wrongful acts or omissions in administering or failing to administer prescribed treatment or confinement."  *Los Angeles County v. Superior Ct. of L.A. Cnty.*, 62 Cal. 2d 839, 843–44 (1965) (cleaned up).  "[E]mployees can . . . be held liable," in which case "the public entity shall pay any judgment against them."  *Id.* at 844 (cleaned up).  But "the public entity cannot be directly sued to enforce its liability for negligence"; "only when [plaintiffs] can establish the liability of specific public employees should the public agency be liable to them."  *Id.* at 844, 846.  Thus, as the Spaths do not allege liability of any specific employee, this immunity shields Defendants from liability related to Noah's injuries during the course of treatment, as to counts three, four, and five of the complaint.  *See id.* at 843 ("[Section 854.8] does not eliminate the county's responsibility for the negligence of its employees in this case but provides that it is not directly liable to [Plaintiff].").

The Spaths invoke the Section 855 exception to Section 854.8 immunity, *see* Cal. Gov. Code § 854.8(a), which states:

A public entity that operates or maintains any medical facility that is subject to regulation by the State Department of Health Services, Social Services, Developmental Services, or Mental Health is liable for injury proximately caused by the failure of the public entity to provide adequate or sufficient equipment, personnel or facilities required by any statute or any regulation of the State Department of Health Services, Social Services, Developmental Services, or Mental Health prescribing minimum standards for equipment, personnel or facilities, unless the public entity establishes that it exercised reasonable diligence to comply with the applicable statute or regulation.

*Id.* § 855(a).  Section 855 is "intended to impose liability only when [a] statute or regulation sets forth a specific standard that gives the public medical facility clear notice as to the minimum requirements with which it must comply."  *Lockhart v. County of Los Angeles*, 155 Cal. App. 4th 289, 308 (2007), *as modified* (Sept. 19, 2007), *as modified* (Oct. 4, 2007).  The Spaths' opposition to the motion to dismiss argues Noah's injuries were proximately caused by Defendants' failure to provide adequate equipment, personnel, or facilities.  But their complaint does not allege that, nor does it cite any "specific standard."  *Id.*  Accordingly, the complaint allegations do not support a plausible inference that the Section 855 exception to Section 854.8 immunity applies.  *See Brackin v. Cal. Dep't of State Hosps.*, No. C 15-03351 WHA, 2016 WL 3185021, at *7 (N.D. Cal. June 8, 2016) (holding complaint did not adequately allege violation of specific minimum standard that would fit within Section 855 exception).

\* \* \*

On the face of the complaint, Noah's Bane Act claim, negligence claim, and medical negligence claim under MICRA are barred in part by Section 856.2 immunity and in whole by Section 854.8 immunity.  Accordingly, Defendants' motion to dismiss is GRANTED as to counts three, four, and five, with leave to amend.  *See Caldwell*, 10 Cal. 4th at 989 (holding trial court correctly dismissed claims barred by immunities as a matter of law); *Yagman*, 852 F.3d at 863.  The Court need not address Defendants' other asserted immunities.  *See Buenavista v. City & County of San Francisco*, 207 Cal. App. 3d 1168, 1173 n.3 (1989).

## CONCLUSION

Defendants' motion to dismiss is GRANTED.  The Spaths may file an amended complaint on or before May 10, 2023.  The April 19, 2023 initial case management conference is

1    CONTINUED to July 6, 2023 at 1:30 p.m. by Zoom video.

2         This Order disposes of Docket No. 19.

3         **IT IS SO ORDERED.**

4    Dated: April 17, 2023

5

6

7                                            JACQUELINE SCOTT CORLEY
                                             United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

16